Filed 8/26/13  P. v. McGhee CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056318 |
| v. | (Super.Ct.No. FSB1102907) |
| DARRYL MCGHEE, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Richard V. Peel, Judge.  Affirmed.

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood, and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

1

I

INTRODUCTION

Defendant Darryl McGhee appeals from judgment entered following jury convictions for two counts of forcible oral copulation upon his ex-girlfriend, Jane Doe (Pen. Code, § 288a, subd. (c)(2)(A)).[1]  The trial court sentenced defendant to an aggregate term of five years in prison.

Defendant contends the trial court erred in excluding evidence of family law and child custody proceedings involving defendant and Jane Doe.  Defendant also argues that the trial court erred when it overruled his objection to reading to the jury his testimony given during the first trial, in which defendant admitted he was guilty of committing a crime.  Defendant further asserts that he received ineffective assistance of counsel when his trial attorney failed to object to the prosecutor asking him if he committed a crime.  We conclude there was no prejudicial error and affirm the judgment.

II

FACTS

Defendant and Jane Doe were in a romantic relationship for eight years, during which they had a daughter.  Their relationship ended in around 2009.  Defendant moved out of their residence and moved to Florida, while Jane Doe and her daughter remained in the family home.  Defendant and Jane Doe never reconciled, although they maintained contact with each other because of their daughter.  After six months, defendant moved

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

back to San Bernardino. When he picked up or dropped off their daughter for visitation, he did not enter Jane Doe's home.

During the evening of June 28, 2011, while Jane Doe was cooking dinner, she heard her daughter say, "What's my daddy doing here[?]" Jane Doe looked out the kitchen window and saw defendant. Although Jane Doe had not invited defendant over, he walked inside towards Jane Doe. Defendant was wearing black basketball shorts and no shirt. Jane Doe was wearing a tank top and shorts.

Jane Doe was not expecting defendant and was upset he was in her home. Jane Doe asked defendant what he was doing there. He said, "I'm sorry, [Jane Doe]. I'm sorry." Defendant tried to give Jane Doe a hug. Jane Doe pushed him away and walked down the hall to her room to get her phone, to call the police. She wanted to get defendant out of her house. Defendant followed her to her bedroom. On the way to her room, Jane Doe repeatedly told defendant to leave.

When Jane Doe got to her room, she grabbed her phone and called 911. Defendant told her not to call the police and to put the phone down. Before the 911 operator answered Jane Doe's call, defendant snatched her phone and put it in his pocket. Jane Doe tried to retrieve her phone but was unable to do so. Defendant refused to return it to her. Defendant attempted to close the bedroom door but their daughter was in the doorway. He pushed their daughter out of the doorway. Defendant then pushed Jane Doe down onto the bed, forcing her to sit on the foot of the bed. When Jane Doe tried to get up, defendant kept pushing her down. Jane Doe told defendant, "get off me."

3

Defendant pushed Jane Doe flat on the bed. While at the foot of the bed, on his knees, defendant put his hand on Jane Doe's chest to hold her down in a supine position and started taking off her clothes. Jane Doe squirmed in an attempt to get up but she was unable to do so because defendant was holding her down and defendant's body was between her legs. Defendant began performing oral sex on Jane Doe. He told her not to move. Meanwhile, Jane Doe squirmed, hit, and punched him, in an attempt to free herself from defendant. Jane Doe testified she was scared, in shock, and angry that she could not get defendant off her.

After defendant stopped performing oral sex, he kissed Jane Doe on her face and neck. Jane Doe continued to struggle against him, fighting to get defendant off her. Defendant then began performing oral sex on Jane Doe again. She told him to get off her. Defendant inserted his fingers in her vagina. Jane Doe repeatedly punched him, tried to push him off her body, and screamed for her daughter. Defendant eventually stopped and tried to leave. He fell off the bed onto the floor. Jane Doe went after him on the floor, punching and kicking him. He jumped up and ran down the hall. Jane Doe chased after him, trying to get her phone out of his pocket. Defendant threw it onto the kitchen wall, breaking the phone, and ran out of the house. Jane Doe then went to the front door and told her son, who was outside, to get the neighbor's phone. Jane Doe went to her room and got dressed. When she returned to the front door, her son handed Jane Doe her neighbor's cell phone and helped her call 911. Jane Doe was unaware that her previous call to 911 had actually gone through and that the entire crime had been audio recorded while her phone was in defendant's pocket.

4

The first 911 call recorded Jane Doe saying "get off me" over a dozen times, and then defendant said, "Don't motherfuckin move no more [Jane Doe]." Jane Doe again repeatedly told defendant to get off her and "I'm not playing with you. Get off of me. [¶] . . . [¶] Get out! Get out! Get out!" After defendant said something unintelligible, the following was recorded:

"[Jane Doe]: H-E-L-P!!! Get off of me! Give me my phone. Give me my phone. Give me my phone.

"[Defendant]: I ain't giving it . . .

"[Jane Doe]: Give me my phone! Give me my phone!

"[Defendant]: (unintelligible) . . .

"[Jane Doe]: Give me my phone. Give me my phone. [¶] . . . [¶]

"[Jane Doe]: . . . call the police. . ."

During the second 911 call, Jane Doe said, "Hi, I need the police out to my house, my daughter's father just came over here and forced his self on me had oral sex with me." Jane Doe told the operator defendant had left and she was using her neighbor's phone because defendant tossed her cell phone, preventing her from using it to call the police. Jane Doe acknowledged she had previously called 911. She also confirmed that defendant had committed oral sex on her three or four minutes earlier. Jane Doe described defendant for the operator and said that her neighbor had seen him jump over her back wall and run away.

5

Jane Doe's neighbor, Gregory Johnson, testified that he saw defendant run out of Jane Doe's house and heard him say, "Oh, fuck. Oh, fuck." Johnson then heard Jane Doe screaming for her son to ask for Johnson's phone. Johnson let her use his phone.

Police Officer Bellamy arrived at Jane Doe's residence about an hour after the dispatch call. Jane Doe was crying and upset. He looked around her house and noticed the comforter on Jane Doe's bed was "kind of messed up" and there was a broken cell phone at the foot of the bed.

After talking with Doe, Bellamy went to defendant's residence and found him lying on his bed. Defendant told Bellamy he had walked into Jane Doe's home through an unlocked screen door. Jane Doe appeared surprised he was there. Defendant told her he wanted to apologize for what had happened in the past and get back together with her. He began kissing and hugging Jane Doe. Jane Doe pushed him away. He followed her into her child's room and Jane Doe began decorating it. Defendant tried to talk to her but she would not listen. Defendant then followed Jane Doe into the master bedroom. Jane Doe picked up her phone to call someone. Defendant took her phone away, threw her onto the bed, and thought she "wanted to wrestle." Defendant lifted up Jane Doe's shirt, began kissing and touching her breasts, pulled down her shorts, and committed oral sex on her. Defendant did not recall Jane Doe saying anything.

Defendant further told Bellamy he thought the encounter was consensual because Jane Doe did not resist. However, later on, she appeared to be getting upset. After he performed oral sex on Jane Doe, she started hitting him. He immediately left.

6

Afterwards, he thought about what had happened and "didn't feel right about the whole thing and [thought] he may have done something wrong."

Although defendant did not testify during the instant trial (second trial), portions of his testimony from the first trial were read to the jury.[2] Defendant acknowledged he was uninvited on June 28, 2011, and Jane Doe pushed him away when they were in the kitchen, but he thought she only did not want him to hug her. Defendant followed Jane Doe into the master bedroom after he had played with their daughter. Jane Doe was sitting on the edge of the bed putting on lotion and talking on her cell phone. He took away her phone and did not return it when she asked him to return it. He then performed oral sex on Jane Doe. He understood that, when she attempted to push him off of her, she wanted him to stop. Nevertheless, he continued to commit oral sex on Jane Doe and conceded he "forceably [*sic*] overcame her will." Defendant weighed 230 to 245 pounds and was 6', 1". Jane Doe weighed about 135 pounds. Defendant finally realized "it just wasn't going well" and stopped, perhaps because Jane Doe was hitting him. Defendant stated he committed oral sex on Jane Doe for her pleasure, not his.

Defendant further testified that his only intent was to do what was best for his family. He did not intend to hurt Jane Doe. Defendant acknowledged that he did not

---

**2** The first trial ended in the jury finding defendant not guilty of counts 1 (assault during a burglary; § 220, subd. (b)) and 3 (sexual penetration by foreign object; § 289, subd. (a)(1)). There was a hung jury as to count 2 (forcible oral copulation; § 288a, subd. (c)(2)), resulting in a mistrial. The prosecution filed a second amended information, alleging two counts of forcible oral copulation (§ 288a, subd. (c)(2)(A)). The instant appeal arises from defendant's appeal of his two convictions in the second trial for forcible oral copulation.

have Jane Doe's consent to do what he had done. He also said he thought his contact with Jane Doe initially was consensual but partway through, it became nonconsensual. He did not believe she wanted him to perform oral sex on her. He conceded that what he did was wrong and had the "reverse effect of what [he] initially planned." He wrote Jane Doe a letter stating that he left her house "feeling like a monster and an idiot" because she did not seem to care about him. He also wrote that he would take any possible plea bargain. Defendant acknowledged he told Jane Doe not to testify. Defendant claimed that Jane Doe's version of what happened was not entirely accurate.

III

EXCLUSION OF CHILD CUSTODY EVIDENCE

Defendant contends the trial court abused its discretion by excluding evidence of pending family law and child custody proceedings involving defendant and Jane Doe (collectively referred to in this opinion as child custody evidence). Defendant argues the child custody evidence was relevant to show Jane Doe's bias and motivation for testifying against defendant. Convicting and incarcerating defendant would aid her objective of obtaining sole custody of their daughter. Jane Doe therefore had a motive to exaggerate her animosity toward defendant. The evidence also refuted the sincerity and truthfulness of her statements made at trial and during her 911 call.

We conclude that the evidence was properly excluded under Evidence Code section 352, and its exclusion did not deprive defendant of his constitutional rights to present a defense or cross-examine witnesses.

*A. Procedural Background*

During the first jury trial, the trial court permitted the child custody evidence and evidence of the restraining order preventing defendant from going to Jane Doe's home or work place. Jane Doe testified during the first trial that defendant persisted in trying to reunite with her and would not leave her alone. He called her and sent her text messages every day. During the second trial, the trial court granted the prosecution's motion to exclude child custody evidence, including related text messages. Defendant objected, arguing the child custody evidence was relevant to establishing that Jane Doe had a motive to use the criminal system and lie about the criminal charges against him in order to manipulate the outcome of the child custody proceedings. The prosecution argued it was undisputed Jane Doe did not consent to the charged acts. Defendant's sole defense was that he did not know Jane Doe had not consented. Therefore the child custody evidence was irrelevant.

The trial court agreed the child custody evidence was irrelevant because it was undisputed that Jane Doe did not consent to the charged crimes. The court therefore excluded the child custody evidence under Evidence Code section 352 as being far more prejudicial than probative.

Later, after voir dire, defendant again objected to exclusion of the child custody evidence on the ground it deprived him of his due process right to present a defense and his Sixth Amendment right to cross-examine Jane Doe regarding her motive to fabricate. The trial court once again overruled defendant's objection, finding that it was undisputed

9

that Jane Doe did not consent to oral copulation. The court excluded the child custody evidence under Evidence Code section 352 as unduly prejudicial and irrelevant.

*B. Discussion*

Defendant argues the child custody evidence was relevant to Jane Doe's credibility as a witness. When determining the credibility of a witness, a jury may consider "any matter that has any tendency in reason to prove or disprove the truthfulness of his [or her] testimony." (Evid. Code, § 780.) On the matter of credibility, the jury may consider the character of the witness "for honesty or veracity." (Evid. Code, § 780, subds. (e) & (h).) "The credibility of a witness may be attacked or supported by any party, including the party calling him [or her]." (Evid. Code, § 785.) Dishonest statements made by a witness are admissible to impeach the witness's credibility. (*People v. Ayala* (2000) 23 Cal.4th 225, 273-274.)

Under Evidence Code section 352, a trial court may "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "For Evidence Code section 352 purposes, prejudice refers to evidence that uniquely tends to evoke an emotional bias against the defendant without regard to its relevance on material issues. [Citation.]" (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 650.) We review a trial court's decision to exclude evidence under Evidence Code section 352 for an abuse of discretion. (*People v. Clark* (2011) 52 Cal.4th 856, 893.)

Here, there was no dispute that defendant committed the act of oral copulation against Jane Doe and that she did not consent to it. This was established by the recorded 911 call, defendant's flight from the scene, defendant's admissions to the police, and his testimony during the first trial. The only factual issue during the second trial was whether defendant had reason to believe Jane Doe consented to oral copulation. The lack of consent was established by the initial 911 recording, during which Jane Doe repeatedly told defendant to get off of her, and the 911 recording after the charged crime, in which Jane Doe said defendant "forced his self on me and had oral sex with me." In addition, defendant testified during the first trial that Jane Doe did not consent.

While Jane Doe's credibility as a victim was relevant, the child custody evidence was not relevant to any issues raised in the instant case or to anything Jane Doe stated during the trial. Furthermore, such evidence could have evoked emotional bias against defendant without regard to material issues, and defendant benefited from exclusion of the evidence because it resulted in the prosecution not introducing into evidence the restraining order evidence. Under such circumstances, the trial court did not abuse its discretion in excluding the child custody evidence under Evidence Code section 352, and its exclusion did not deprive defendant of his right to present a defense.

IV

ADMISSIBILITY OF DEFENDANT'S TESTIMONY ADMITTING GUILT

Defendant contends the trial court abused its discretion when, during the second trial, the court permitted the prosecution to read into evidence defendant's testimony provided during the first trial, in which he admitted he committed a crime. Defendant

11

challenges the following excerpt read from cross-examination of defendant during the first trial:

"Q. So what you are saying is you committed the crime? You are guilty?

"A. I already told you that what I did to her was wrong like I feel bad. I really do feel bad for the situation that take hand, yes. You asked me did I commit a crime. That's a hard question, but I'm going to have to say, yes, because a crime was committed."

After the prosecutor in the second trial finished reading to the jury various additional excerpts from defendant's testimony during the first trial, defendant objected outside the presence of the jury to the court allowing the above quoted evidence. Defense counsel explained that she did not object during the first trial because defendant was on the stand, testifying, and she knew she would have an immediate opportunity during redirect examination to clarify that defendant was "not a lawyer, had absolutely no legal knowledge whatsoever and that that answer was not based on any knowledge. I did not object at that time with that knowledge in mind. *I am objecting now to the form of that question as it calls for a legal conclusion.*" (Italics added.) The trial court overruled the objection under Evidence Code section 1291, subdivision (b)(1), on the grounds defendant did not object in the previous trial to the former testimony and the form of the question.

Evidence Code section 1291, subdivision (b)(1), provides: "(b) The admissibility of former testimony under this section is subject to the same limitations and objections as though the declarant were testifying at the hearing, except that former testimony offered

12

under this section is not subject to:  [¶]  (1) Objections to the form of the question which were not made at the time the former testimony was given."

Defendant argues Evidence Code section 1291, subdivision (b)(1), provides that only objections to the *form* of a question are waived.  All other objections are preserved. Defendant asserts that his objection to being asked if he committed a crime was not to the form of a question but to the subject matter or substance and, therefore, the objection was not waived.  But defendant's trial attorney acknowledged, when she raised the objection during the second trial, that she was "objecting now to the form of that question as it calls for a legal conclusion."  Therefore, under Evidence Code section 1291, subdivision (b)(1), the objection was forfeited.

Even assuming defendant did not forfeit the objection, the evidence of guilt was admissible under Evidence Code section 1291, subdivision (a), which states:  "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and:  [¶]  (1) The former testimony is offered against a person who offered it in evidence in his own behalf on the former occasion . . . ; or [¶]  (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

Here, defendant was unavailable as a witness because he chose not to testify during the second trial.  His prior testimony, admitting he committed a crime and was guilty, was offered against defendant.  Furthermore, during his testimony in the first trial,

13

his attorney had the opportunity to rehabilitate and clarify defendant's testimony. During redirect examination, defendant testified he was not a lawyer; he did not know the intricacies of the law; he did not know the elements of the charged crime; he did not act maliciously or viciously; he did not use force; he did not penetrate Jane Doe's vagina; and he did not intend to sexually assault her when he entered her home.

The testimony was also admissible under Evidence Code section 1220, which allows a party admission: "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his individual or representative capacity, regardless of whether the statement was made in his individual or representative capacity."

Citing *People v. Torres* (1995) 33 Cal.App.4th 37 (*Torres*), defendant argues that the prosecutor's question in the first trial, asking defendant whether he committed a crime and was guilty, called for inadmissible evidence. In *Torres,* at pages 46-47, the court stated:

> "*A Witness May Not Express an Opinion as to the Guilt or Innocence of the Defendant.* [¶] A consistent line of authority in California as well as other jurisdictions holds a witness cannot express an opinion concerning the guilt or innocence of the defendant. [Citations.] [T]he reason for employing this rule is not because guilt is the 'ultimate issue of fact' to be decided by the jury. Opinion testimony often goes to the ultimate issue in the case. [Citation.] Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier

14

of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt."

The court in *Torres* further stated with regard to opinion testimony on whether a crime has been committed:

"*A Witness May Not Express an Opinion as to Whether a Crime Has Been Committed.* [¶] Although we have found no California case directly on point, we believe the same rationale which prohibits the witness from expressing an opinion on the meaning of statutory terms or the guilt of the defendant also prohibits the witness from expressing an opinion as to whether a crime has been committed." (*Torres, supra,* 33 Cal.App.4th at p. 47.)

*Torres* is distinguishable from the instant case in that *Torres* concerns testimony by an expert witness, not testimony by a defendant regarding whether he believes he has committed a crime and is guilty. (*Torres, supra,* 33 Cal.App.4th at p. 47.) While expert opinion on guilt or innocence is inadmissible because it is of no assistance to the trier of fact (*People v. Vang* (2011) 52 Cal.4th 1038, 1048), a defendant's opinion and belief as to whether he or she is guilty of committing a crime is relevant, probative evidence, which is of assistance to the trier of fact. Here, defendant's testimony that he believed he had committed a crime and was guilty, was admissible under Evidence Code sections 1220 and 1291, as relevant, probative evidence and as an admission of wrongdoing.

# V

## INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends that his trial attorney committed ineffective assistance of counsel by failing to object during the first trial to the prosecutor's question asking defendant if he committed a crime. Defendant has not established ineffective assistance of counsel.

"To demonstrate ineffective assistance of counsel, a defendant must show that counsel's action was, objectively considered, both deficient under prevailing professional norms and prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) To establish prejudice, a defendant must show a reasonable probability that, but for counsel's failings, the result of the proceeding would have been more favorable to the defendant. (*Id.* at p. 694.)" (*People v. Hinton* (2006) 37 Cal.4th 839, 876 (*Hinton*).) We "'". . . defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" [Citation.] "[W]e accord great deference to counsel's tactical decisions" [citation].'" (*Ibid.*) "'"[C]ourts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" [citation]. "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." [Citation.]' [Citation.]" (*Ibid.*)

Here, defendant has not established ineffective assistance since defense counsel may have chosen not to object for reasonable tactical reasons. As defense counsel

16

explained to the trial court during the second trial, she did not object to the question during the first trial because she believed that during redirect, she could clarify and rehabilitate defendant's statement that he committed a crime. Defense counsel may have believed it would be more advantageous to rehabilitate defendant through redirect examination than to object to the question and move to strike defendant's response. In addition, defendant's response provided an opportunity to explain to the jury why it should find defendant had not committed a crime, through testimony that defendant did not use force, did not penetrate Jane Doe's vagina, and did not act maliciously or viciously intend to hurt Jane Doe. Defendant claimed he acted with the intent to revive his relationship with Jane Doe. Defendant was given the opportunity to explain his conduct in a conciliatory, apologetic manner.

Because there was a reasonable strategic reason for defense counsel not objecting to the prosecutor asking defendant if he committed a crime, defendant has not established ineffective representation. Furthermore, even if defense counsel was deficient in failing to object to the inquiry, defendant failed to demonstrate there was a reasonable probability that, but for the question and defendant's response, the trial outcome would have been different. (*Torres, supra,* 33 Cal.App.4th at p. 49; *People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.) There was overwhelming evidence defendant committed the crime of forcible oral copulation. Such evidence included defendant's statements to the police, trial testimony, and the recorded 911 calls.

## VI

## DISPOSITION

The judgment is affirmed

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

KING
J.

18